FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

MAY 1 6 2008

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| RAMON REYES,<br><br>　　　　　　Petitioner,<br><br>　　v.<br><br>LARRY E. SCRIBNER, Warden,<br><br>　　　　　　Respondent. | No. CV 06-7958-ODW (AGR)<br><br>ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION |

Pursuant 28 U.S.C. § 636, the Court has reviewed the entire file de novo, including the magistrate judge's Report and Recommendation.  The Court agrees with the recommendation of the magistrate judge.

IT IS ORDERED that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED: ___5-12-08___

_____
OTIS D. WRIGHT II
UNITED STATES DISTRICT JUDGE

1

2

3

4

5

6

7

8               UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10

11    RAMON REYES,                          )        NO. CV 06-7958-ODW (AGR)
                                            )
12               Petitioner,                )
                                            )
13          v.                              )
                                            )
14    LARRY E. SCRIBNER, Warden,            )        REPORT AND
                                            )        RECOMMENDATION OF UNITED
15               Respondent.                )        STATES MAGISTRATE JUDGE
                                            )
16  _____)

17

18          The Court submits this Report and Recommendation to the Honorable Otis

19    D. Wright II, United States District Judge, pursuant to 28 U.S.C. § 636 and

20    General Order No. 05-07 of the United States District Court for the Central District

21    of California.  For the reasons set forth below, the Magistrate Judge recommends

22    the Petition for  Writ of Habeas Corpus be denied.

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

1

I.

2

## SUMMARY OF PROCEEDINGS

3       On March 6, 2003, a Los Angeles County jury convicted Petitioner of

4   second-degree murder (victim Leo Elder); premeditated, attempted murder

5   (victim Kimberly Garcia); and assault with a firearm (victim Steve Chavez); the

6   jury also found true that Petitioner used a firearm.  (Petition at 2; Answer at 1;

7   Lodged Document ("LD") 1 at 97-99.)  The jury acquitted Petitioner of the

8   attempted murder of Jesus Lopez.  (LD 1 at 299.)   On April 3, 2003, Petitioner

9   was sentenced to 72 years to life.  (Petition at 2; Answer at 1.)

10      On December 21, 2004, the California Court of Appeal affirmed the

11  conviction.  (LD 7.)  On March 23, 2005, the California Supreme Court denied

12  review "without prejudice to any relief to which defendant might be entitled after

13  this court determines in *People v. Black*, S126182, and *People v. Towne*,

14  S1125677, the effect of *Blakely v. Washington* (2004) __ U.S. __ 124 S.Ct. 2531,

15  on California law."  (LD 10.)

16      On December 2, 2005, Petitioner filed a petition for writ of habeas corpus in

17  the California Supreme Court, which was denied without explanation on

18  September 13, 2006.  (LD 11, 12.)

19      On December 14, 2006, Petitioner filed a Petition for Writ of Habeas

20  Corpus by a Person in State Custody in this Court in which he raised five

21  grounds:  (1) insufficient evidence to support his conviction of attempted murder;

22  (2) his consecutive sentences violated his Sixth Amendment rights; (3) erroneous

23  admission of testimony and ineffective assistance of counsel; (4) prosecutorial

24  misconduct and ineffective assistance of counsel; and (5) ineffective assistance

25  of counsel for failing to impeach Eddie Cervantes.  On August 9, 2007,

26  Respondent filed an answer, admitting timeliness and exhaustion.  (Answer at 2.)

27  On September 26, 2007, the Court issued an order noting that Petitioner's reply

28  was overdue, affording him thirty days to file a reply, and advising him that failure

2

1  to file a timely reply might result in the allegations of the answer being accepted

2  as true, and that the matter would be deemed submitted on the day after

3  Petitioner's reply was due.

4      Petitioner failed to file a timely reply, this matter was taken under

5  submission, and is now ready for decision.

6                                  II.

7                        **STATEMENT OF FACTS**

8      Below are the facts set forth in the California Court of Appeal decision on

9  direct review.  To the extent an evaluation of Petitioner's claims for relief depends

10  on an examination of the record, the Court has made an independent evaluation

11  of the record specific to Petitioner's claims for relief.

12      A fistfight broke out between two groups of men in the bleachers during an

13      auto race at Irwindale Speedway. A few rows away from the fighting,

14      appellant drew a gun and fatally shot Leo Elder. Appellant then aimed at

15      Kimberly Garcia, who was standing in front of the bleachers and looking at

16      appellant. As Garcia ran, appellant fired twice and struck her with each

17      shot. Garcia suffered serious, permanent injuries. A man, who apparently

18      gave a false name of Steve Chavez, was grazed by a bullet. The police

19      apprehended appellant in the parking lot.

20  (LD 7 at 2.)

21                                 III.

22                        **STANDARD OF REVIEW**

23      A federal court may not grant a petition for writ of habeas corpus by a

24  person in state custody with respect to any claim that was adjudicated on the

25  merits in state court unless it (1) "resulted in a decision that was contrary to, or

26  involved an unreasonable application of, clearly established Federal law, as

27  determined by the Supreme Court of the United States"; or (2) "resulted in a

28  decision that was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Woodford v. Visciotti*, 537 U.S. 19, 21, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (per curiam).

"'[C]learly established Federal law' . . . is the governing legal principle or principles set forth by the Supreme Court at the time the state court rendered its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). A state court's decision is "contrary to" clearly established Federal law if (1) it applies a rule that contradicts governing Supreme Court law; or (2) it "confronts a set of facts . . . materially indistinguishable" from a decision of the Supreme Court but reaches a different result. *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002). A state court's decision cannot be contrary to clearly established Federal law if there is a "lack of holdings from" the Supreme Court on a particular issue. *Carey v. Musladin*, 127 S. Ct. 649, 654, 166 L. Ed. 2d 482 (2006).

Under the "unreasonable application prong" of section 2254(d)(1), a federal court may grant habeas relief "based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Lockyer*, 538 U.S. at 76; *see also Woodford*, 537 U.S. at 24-26 (state court decision "involves an unreasonable application" of clearly established federal law if it identifies the correct governing Supreme Court law but unreasonably applies the law to the facts).

A state court's decision "involves an unreasonable application of [Supreme Court] precedent if the state court either unreasonably extends a legal principle . . . to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

"In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more

4

than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520-21, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (citation omitted). "The state court's application must have been 'objectively unreasonable.'" *Id.* (citation omitted); *see also Clark v. Murphy*, 331 F.3d 1062, 1068 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003); *see also Mitleider v. Hall*, 391 F.3d 1039, 1046 (9th Cir. 2004), *cert. denied*, 545 U.S. 1143 (2005).

In applying these standards, this Court looks to the last reasoned State court decision. *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006). To the extent no such reasoned opinion exists, as when a state court rejected a claim in an unreasoned order, this Court must conduct an independent review to determine whether the decisions were contrary to, or involved an unreasonable application of, "clearly established" Supreme Court precedent. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). If the state court declined to decide a federal constitutional claim on the merits, this Court must consider that claim under a *de novo* standard of review rather than the more deferential "independent review" of unexplained decisions on the merits authorized by *Delgado*. *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (standard of *de novo* review applicable to claim state court did not reach on the merits).

## IV.

## DISCUSSION

### A.   GROUND ONE: Insufficient Evidence

"[T]he Due Process Clause protects the accused against conviction except

5

1   upon proof beyond a reasonable doubt of every fact necessary to constitute the

2   crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct.

3   1068, 25 L. Ed. 2d 368 (1970). "[T]he critical inquiry on review of the sufficiency

4   of the evidence to support a criminal conviction must be . . . to determine whether

5   the record evidence could reasonably support a finding of guilt beyond a

6   reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L.

7   Ed 2d 560 (1979).  This inquiry does not require a court to "ask itself whether it

8   believes that the evidence at the trial established guilt beyond a reasonable

9   doubt" [but] whether, after viewing the evidence in the light most favorable to the

10   prosecution, any rational trier of fact could have found the essential elements of

11   the crime beyond a reasonable doubt." *Id.* at 318-19 (citations omitted).  A

12   reviewing court must give "full play to the responsibility of the trier of fact fairly to

13   resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

14   inferences from basic facts to ultimate facts." *Id.* at 319.

15          Petitioner contends there was insufficient evidence of premeditation and

16   deliberation to convict him of the attempted murder of Kimberly Garcia.  (Petition,

17   Memo at 16.)

18          The California Court of Appeal, whose decision was the last reasoned

19   decision under *Davis*, applied the correct legal standard.  (LD 7 at 3.)  The next

20   step in the inquiry is to examine "the elements of the criminal offense as set forth

21   by state law." *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005), *cert. denied*,

22   126 S. Ct. 1142 and 126 S. Ct. 1145 (2006).  The Court of Appeal described the

23   element of premeditation and deliberation as follows:

24          [P]remeditation requires that the act be considered beforehand.

25          Deliberation requires careful thought and weighing of considerations

26          for and against the act.  The extent of the reflection, not the length of

27          time, is the true test.  These processes can occur very rapidly, even

28          after an altercation is under way.

6

1        * * *

2        Three types of evidence . . . typically support a finding of

3        premeditation and deliberation[:]  planning activity, a prior

4        relationship with the victim or conduct from which a motive could be

5        inferred, and a manner of killing from which a preconceived plan

6        could be inferred.

7  (LD 7 at 3 (citations omitted).)  These three categories of evidence are

8  "guidelines" to assist a court in determining "whether the evidence supports an

9  inference that . . . attempted killing resulted from preexisting reflection and

10  weighing of considerations, rather than an unconsidered or rash impulse." (*Id.* at

11  4.)

12      The state court concluded there was "[s]ubstantial evidence" to support the

13  conviction. (*Id.* at 6.)  First, Petitioner took a loaded gun to the racetrack

14  (planning).  Second, Garcia (and Lopez) stayed while everyone else left.  They

15  looked right at Petitioner who saw them looking at him and aimed his gun at

16  them.  The jury could infer that Petitioner wanted to eliminate witnesses to the

17  Elder murder (motive).  Third, Petitioner's shots at Garcia were spaced two to

18  seven seconds apart, indicating some reflection, and Petitioner appeared calm.

19  Additionally, Petitioner adjusted his aim to track Garcia as she ran, indicating

20  deliberation (manner of killing).  Third, Garcia was not in the vicinity of the fight.

21  (*Id.* at 6-7.)

22      The record supports the state court's factual determinations.  Petitioner

23  brought a gun to the track that night.  (LD 2 at 1529, 1532.)  He had picked up the

24  gun at a friend's house that afternoon.  (*Id.* at 1530.)  He was "pretty sure" it was

25  ///

26  ///

27  ///

28  ///

1  loaded. (*Id.* at 1531.)[1]  When he was at the track, the gun was concealed in the

2  waistband of his pants. (*Id.* at 1532-33.)

3        Garcia testified she went to the racetrack with her boyfriend, Jesus Lopez,

4  on the day of the crimes. (*Id.* at 992-93.)  She was sitting with Lopez when she

5  heard a shot behind and above her. (*Id.* at 995-96.)  She turned around and saw

6  Petitioner standing by himself while everyone ran away from him. (*Id.* at 996-97.)

7  Petitioner was pointing the gun at Garcia, looking directly at her, and she "looked

8  him right in the eye"; that lasted about one or two seconds. (*Id.* at 996, 999-1000,

9  1004.)  Garcia began to run toward the gate. (*Id.* at 998.)  She had gone "about

10 two steps" when she heard a second shot, about two seconds after the first; that

11 shot hit her. (*Id.* at 1000.)  Arnold, another spectator at the track that night,

12 testified that 5-7 seconds separated the first two shots. (*Id.* at 438-39, 443.)

13 About two seconds after the second shot, after Garcia had "gone around the

14 corner towards the gate," she was hit by a third shot. (*Id.* at 1000.)  Arnold

15 testified that 5-7 seconds separated the second and third shots. (*Id.* at 443.)  He

16 testified that the shots were not "rapid," but "staggered." (*Id.*)  Officer Gonzales,

17 who was on duty that night at the track, testified he heard three to four shots that

18 "weren't rapid." (*Id.* at 607-08.)  According to Gonzales, about five seconds

19 elapsed between the first and third shots. (*Id.* at 622.)

20        Jesus Lopez also identified Petitioner as the shooter. (*Id.* at 1027.)  Lopez

21 made eye contact with Petitioner, "and he just like turned and pointed towards me

22 and Kimberly." (*Id.* at 1030.)  Lopez first heard a commotion and then the first

23 shot. (*Id.* at 1038.)  Lopez turned back to look and then heard the second shot

24 while he was looking at Petitioner and Petitioner was "pointing the gun at us." (*Id.*

25 at 1038, 1031.)  The crowd was "spreading out" because "they saw him pointing

26

27        [1]  At first, Petitioner said "I just had it with me" and that he took it for "[n]o

28 apparent reason.  Just to take it to my house." (*Id.* at 1529-30.)  Later, Petitioner
   stated he took the gun to sell it. (*Id.* at 1532.)

1  the gun." (*Id.* at 1039.)  Petitioner was "the only person standing in the middle."
2  (*Id.* at 1046.)  Lopez and Garcia began to run, and after they had run 15-20 feet,
3  there was a third shot, which hit Garcia.  (*Id.* at 1032.)

4       Jimmy Cervantes lived on the same street as Petitioner.  (*Id.* at 940.)  They
5  were not friends, but Petitioner used to come over to Jimmy's house to play with
6  his younger brother Vicente.  (*Id.* at 941.)  Jimmy went to the racetrack on the day
7  of the crimes.  (*Id.* at 943.)  Jimmy spoke to the police on the night of the crimes
8  at about 4:00 a.m.  (*Id.* at 946-47.)  That conversation was taped and transcribed.
9  (*Id.* at 947-48.)  Jimmy testified that the transcript was accurate.  (*Id.* at 954.)
10 Jimmy told the police that he saw Petitioner "walking down the stairs like nothing
11 is happening."  (*Id.* at 955.)  Directly after that, he heard shots.  (*Id.*)  Jimmy
12 testified that he told the police he saw Petitioner shooting and that "he was trying
13 to hit somebody that was running."  (*Id.* at 959, 966-67.)  Although Jimmy testified
14 that he made all those statements to the police, he also testified that he did not
15 tell the police the truth.  (*Id.* at 954.)

16      Kathleen Flores went to the racetrack with her family on the night of the
17 crimes.  (*Id.* at 1205-06.)  She saw Petitioner walking down the stairs of the
18 bleachers, "very calmly," with a gun in his hand.  (*Id.* at 1209-11.)

19      Petitioner argues that the motive of wanting to eliminate witnesses to the
20 Elder murder "makes no sense" because of the large number of other witnesses
21 present.  (Petition, Memo at 17.)  However, the record shows that Garcia and
22 Lopez looked directly at Petitioner while he was pointing a gun at them.  (LD 2 at
23 996, 999-1000, 1004, 1030.)  Thus, the jury could have inferred that, unlike the
24 other people in the crowd, these two individuals could have identified him.

25      Petitioner also argues that the evidence shows that he "fired rashly and
26 impulsively," but only Petitioner's testimony supports that conclusion.  The rest of
27 the evidence contradicts it.   The jury is entitled to weigh the evidence as it sees
28 fit.  *Jackson*, 443 U.S. at 319.

1    Petitioner also argues that the witnesses "were virtually unanimous that the

2    shots were fired in close succession." (Petition, Memo at 17.)  However, the

3    evidence supports the Court of Appeal's factual determination that the shots were

4    spaced between two to seven seconds apart.  (LD 7 at 6; LD 2 at 1000, 439, 443,

5    607-08.)  Numerous California decisions have held that the amount of time is not

6    dispositive of premeditation.  *See, e.g., People v. Manriquez*, 37 Cal. 4th 547,

7    577, 36 Cal. Rptr. 3d 340 (2005) ("The true test is not the duration of time as

8    much as it is the extent of the reflection. Thoughts may follow each other with

9    great rapidity and cold, calculated judgment may be arrived at quickly.") (citations

10   and internal quotation marks omitted), *cert. denied*, 126 S. Ct. 2359 (2006);

11   *People v. Brito*, 232 Cal. App. 3d 316, 324, 283 Cal. Rptr. 441 (1991) ("The fact

12   that Brito's formulation of the manner in which he would attempt to kill his victim

13   may have occurred during a matter of seconds as his victim exited the vehicle,

14   does not defeat the substantiality of the evidence in support of deliberation and

15   premeditation."); *see also Davis v. Woodford*, 384 F.3d 628, 640 (9th Cir. 2004)

16   ("'The law does not undertake to measure in units of time the length of the period

17   during which the thought must be pondered before it can ripen into an intent to kill

18   which is truly deliberate and premeditated.'") (quoting from California's model jury

19   instructions), *cert. denied sub nom. Davis v. Brown*, 545 U.S. 1165 (2005).

20   The Court of Appeal's decision was not contrary to United States Supreme

21   Court law, or based on an unreasonable determination of the facts in light of the

22   evidence.  Petitioner's claim fails.

23   **B.    GROUND TWO: <u>Consecutive Sentences</u>**

24   "'Other than the fact of a prior conviction, any fact that increases the

25   penalty for a crime beyond the prescribed statutory maximum must be submitted

26   to a jury, and proved beyond a reasonable doubt.'"  *Blakely v. Washington*, 542

27   U.S. 296, 301, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) (quoting *Apprendi v.*

28   *New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)).

1   Petitioner was sentenced to consecutive sentences on the murder, the

2   attempted murder, and the assault with a firearm. (LD 2 at 2707.) The trial court

3   stated that the basis for imposing consecutive sentences was that "each count . .

4   . involve[d] a separate act with separate criminal intents." (*Id.*)

5   The California Court of Appeal, whose decision was the last reasoned

6   decision under *Davis*, concluded that the imposition of consecutive sentences did

7   not violate *Blakely* or *Apprendi* because no additional fact finding was required.

8   (LD 7 at 20 ("The court has the authority to impose consecutive terms without

9   finding any additional facts.").) Petitioner argues that California requires a trial

10   judge to state the reason for imposing consecutive sentences. (Petition, Memo at

11   14.) However, the Court of Appeal concluded that California Rules of Court

12   4.406(b)(5) states that consecutive sentences "generally require a statement of

13   reason," but "no statute or rule of court requires the court to make an additional

14   factual finding, above and beyond the mere fact of conviction of multiple current

15   offenses." (LD 7 at 20.) There is no statutory presumption in favor of concurrent

16   sentences. (*Id.* at 19.)

17   The jury convicted Petitioner of three separate crimes involving three

18   separate victims, which was inherent in the jury's verdicts and did not require

19   impermissible fact-finding by the trial judge.[2]  *See Sandoval v. Campbell*, 2007

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   _____

28   [2]  Petitioner's argument to the contrary is based upon his own version of
events, which the jury was free to disbelieve. *Jackson*, 443 U.S. at 319.

11

1  WL 3274236 (E.D. Cal. 2007);[3] *see also Garcia v. Brown*, 2007 WL 3146962

2  (N.D. Cal. 2007).[4]

3       Petitioner has not cited any United States Supreme Court holding that

4  consecutive sentences violate a defendant's Sixth Amendment rights.  *Carey*,

5  127 S. Ct. at 654; *see also Hassinger v. Adams*, 243 Fed. Appx. 286, 288 (9th

6  Cir. 2007) ("Hassinger's claim that the trial court erred in imposing his sentences

7  consecutively rather than concurrently does not implicate the constitutional rights

8  involved in *Blakely*"), *cert. denied*, 128 S. Ct. 209 (2008); *Esmay v. Runnels*,

9  2007 WL 3105072 (N.D. Cal. 2007).[5]

10       Petitioner's claim fails.

11  **C.**    **GROUND THREE:** **Improper Opinion Testimony and Ineffective**

12         **Assistance**

13       Ground Three has two subgrounds.  In the first, Petitioner argues that his

14  due process rights were violated because of the admission of improper opinion

15  ///

16

17     [3] In *Sandoval*, the petitioner challenged the state trial court's determination

18  that his offenses "were committed separately or with separate intents and objectives."  *Id.* at *10.  The federal district court found that "*Apprendi* and *Blakely*

19  are concerned with findings of fact 'that increase[] the penalty for a crime beyond the prescribed statutory maximum.'"  *Id.* (quoting *Blakely*, 542 U.S. at 301).  "At

20  issue in [*Apprendi* and *Blakely*] is the sentence for a single crime, not the aggregate effect of a defendant's sentences for multiple offenses.  In neither

21  [*Apprendi* or *Blakely*] did the Court rule as to whether a defendant should serve individual sentences concurrently or consecutively."  *Id.* (citations omitted).

22     [4] In *Garcia*, the state trial court imposed consecutive sentences because

23  the crimes "involved separate victims and separate felonies."  *Id.* at *10.  The federal district court found that *Blakely* and *Apprendi* were distinguishable

24  because the sentences were "fully authorized by the jury's findings".  *Id.* at *11. "[T]he jury found Petitioner guilty beyond a reasonable doubt of the three

25  separate felonies charged."  *Id.*

26     [5] In *Esmay*, the court found that "[t]he Supreme Court's cases in the *Apprendi* line do not contain any indication that the holdings regarding jury trial

27  rights and proof beyond a reasonable doubt apply to consecutive sentences."  *Id.* at *12.  The court also held that "there is no 'clearly established' Supreme Court

28  authority applying *Apprendi* and its Supreme Court progeny to consecutive sentences."  *Id.*

testimony from a lay witness.  In the second, Petitioner argues that his trial counsel was ineffective for failing to object to the testimony.

### 1.    Subground One - Improper Opinion Testimony

Whether evidence was "incorrectly admitted . . . pursuant to California law . . . is no part of a federal court's habeas review of a state conviction." *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (internal quotation marks omitted) (first ellipses in original).  The only issue is whether the admission violated Petitioner's "federal constitutional rights." *Id.* at 68; *see also Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  Thus, the key question is whether "the trial court committed an error which rendered the trial so arbitrary and fundamentally unfair that it violated federal due process." *Id.* at 920 (internal quotation marks omitted).

Deputies Smith and Miley interviewed Petitioner on the morning of August 16, 2002, the day after the crimes.  (LD 2 at 1577.)  At the defense's request, the audio recording of that interview was played for the jury.  (*Id.* at 1590.)  The defense asked Smith questions about the interview.  (*Id.* at 1577-94.)  During cross-examination by the prosecutor, Smith testified as follows:

Q    People that are innocent tell you the truth; isn't that right?

A    Yes.

* * *

Q    When you say it's quite common for people to lie to you, it's not innocent people who lie to you quite commonly, is it?

A    No.  Innocent people usually don't lie to me.

* * *

Q    By the way, when you're telling him all of this about you believe him and all of this, obviously, you hadn't heard the testimony he gave today?

A    That's correct.

13

1 Q Does that change your opinion about whether or not you believe him as

2   to what you've heard today in court?

3 A I don't believe him at all now.

4 * * *

5 Q Do you see where he says, "I'm not going to lie to you.  I shot once"?

6 A Yes.

7 Q In fact, according to his testimony today on the stand, that is a lie, isn't

8   it?

9 * * *

10 A That he said it or –

11 Q That he shot once.

12 A Oh, yes, definitely.

13 * * *

14 Q You said you believe him, and you've already made clear to the court

15   and to the jury why you said that that night.

16 A I believed a lot of what he told us at the time.

17 Q And why is that, again?

18 A Well, a lot of it was consistent with what we knew at the time. * * * [¶] At

19   that time, I really didn't have a lot of reason not to believe him right

20   then at that time.  I thought he was evasive on some points.  I thought

21   maybe he was hedging or lying on some issues.  But there were some

22   consistencies in his statement with the evidence at the scene.

23 Q You told him that day you had a lot of respect for him?

24 A Yes, I did.

25 Q Why did you say that?

26 A Because he did tell us that he fired three times.  He did tell us what

27   seemed at the time to be a plausible story.  And I'm sure he was very

28   nervous.  I'm sure that took a lot of guts.

14

1    Q   At this same time, do you hold the same opinion?

2    A   No, not knowing what I know now.

3  (*Id.* at 1595, 1597-98, 1602, 1603-04.)  As the Court of Appeal found, Petitioner's

4  counsel did not object to any of these questions on the basis that Smith's

5  testimony was improper lay opinion, nor did counsel ask that any of the

6  responses be stricken on that basis.  (LD 7 at 9.)

7       Miley was recalled by the prosecution in rebuttal and testified as follows:

8    Q   You heard Detective Smith indicate on the tape . . . that she believed

9        the defendant that night at least partially.  Did you ever believe the

10       defendant that night?

11   A   Not really.

12   Q   Why not?

13   A   Well, I thought he was truthful in the number of rounds he had fired, but

14       that was very difficult to get out of him.  And it started – I based my

15       opinion of the defendant on once we began the interview when he

16       signed his rights card with the right hand and then said he was left

17       handed.  I thought from then on, it was going to be difficult for us to

18       extract the truth from him.

19  (LD 2 at 1613.)  Again, the Court of Appeal found that Petitioner's counsel did not

20  object to these questions on the basis that the testimony was improper lay

21  opinion, nor did counsel ask that any of the responses be stricken on that basis.

22  (LD 7 at 9.)

23       The Court of Appeal, whose decision is the last reasoned decision under

24  *Davis,* found that Petitioner had waived his right to object on appeal that his due

25  process rights were violated because he failed to object below.  (LD 7 at 9.)

26  Respondent argues that this subground is therefore procedurally barred.

27  (Answer at 22.)  However, because the procedural bar issue is more complex, the

28  Court will proceed to the merits, which leads to the same result.  *Franklin v.*

15

1   *Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002); *see also Lambrix v. Singletary*,

2   520 U.S. 518, 525, 117 S. Ct. 1517, 137 L. Ed. 2d 771 (1997) ( a *Teague* issue

3   may be resolved before a procedural bar issue if the procedural bar "involved

4   complicated issues of state law").

5        The state court *did* address Petitioner's alternative ground of ineffective

6   assistance of counsel, finding that Petitioner was not prejudiced by his counsel's

7   performance.  The lack of prejudice on ineffective assistance is similar to the lack

8   of prejudice on the alleged due process violation.  Because the Court finds that

9   the state court's analysis on prejudice was neither contrary to United States

10  Supreme Court law nor an unreasonable determination of the facts (*see*

11  Subground Two below), Petitioner's due process claim fails.

12              **2.    Subground Two - Ineffective Assistance**

13       To succeed on a claim of ineffective assistance of trial counsel, Petitioner

14  must demonstrate that his attorney's performance was deficient and that the

15  deficient performance prejudiced the defense.  *Strickland v. Washington*, 466

16  U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Wiggins*, 539 U.S. at

17  521.  The petitioner bears the burden of establishing both components.  *Williams*,

18  529 U.S. at 390-91; *Smith v. Robbins*, 528 U.S. 259, 285-86, 120 S. Ct. 746, 145

19  L. Ed. 2d 756 (2000).  "Deficient performance is performance which is objectively

20  unreasonable under prevailing professional norms."  *Hughes v. Borg*, 898 F.2d

21  695, 702 (9th Cir. 1990) (citing *Strickland*, 466 U.S. at 688).  Prejudice "focuses

22  on the question whether counsel's deficient performance renders the . . .

23  proceeding fundamentally unfair."  *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.

24  Ct. 838, 122 L. Ed. 2d 180 (1993) (citing *Strickland*, 466 U.S. at 687); *Williams*,

25  529 U.S. at 393 n. 17.  The Court need not address both components if Petitioner

26  makes an insufficient showing on one.  *Strickland*, 466 U.S. at 697.

27       The Court of Appeal found that Petitioner's counsel's failure to object to the

28  introduction of the opinions of the two detectives was "objectively unreasonable."

16

1 (LD 7 at 10.)  However, the court also found that Petitioner would not have

2 "obtained a more favorable result had the jury not heard the detectives' opinion

3 testimony." (*Id.* at 14.)

4      The state court found that "Smith's testimony that innocent people usually

5 did not lie was essentially a matter of common sense." (*Id.* at 10.)  Smith's

6 answer that Petitioner said initially in his police interview that fired only one shot

7 but then admitted both in the interview and at trial that he fired three "added

8 nothing to the prosecution's case." (*Id.* at 10-11.)

9      With respect to Petitioner's murder conviction, the main issue was whether

10 the jury believed the defense theories that Petitioner acted in self-defense,

11 defense of others, unreasonable self-defense, or heat of passion. (*Id.* at 11.)

12 There were many inconsistencies in the evidence:  (1) between different versions

13 of the event Petitioner presented in the police interview itself, (2) between

14 Petitioner's version of the events during the police interview and his version at

15 trial, and (3) between his version at trial and other witnesses' versions.  As the

16 Court of Appeal found, during the interview Petitioner initially said he heard

17 someone else shoot. (*Id.*; LD 1 at 167.)  After the police told him they found his

18 gun (*id.* at 170), Petitioner said he shot only once, which he repeated many times.

19 (*Id.* at 175, 181, 188, 193, 195; LD 7 at 11 ("[Petitioner] steadfastly insisted he

20 fired just once").)  Finally, after the police insisted the evidence showed he shot

21 more than once, Petitioner admitted he shot twice more. (LD 1 at 202.)

22 Petitioner then admitted at trial that he never heard anyone else shoot that night,

23 and that he lied when he first told the police he shot only once. (LD 2 at 1543,

24 1558.)

25      In addition, the Court of Appeal outlined Petitioner's inconsistencies in the

26 police interview and trial involving Junior (known as Santa Cruz). LD 7 at 12.)

27 Petitioner initially told the police that he didn't think Junior was going to get hurt

28 seriously in the fight at the racetrack. (LD 1 at 166.)  When the police told

1    Petitioner they had heard that Junior was "getting beat to shit," Petitioner

2    "adopted this explanation" (LD 7 at 12), repeating the police's phrase, "He was

3    getting beat to shit." (LD 1 at 173.)  By contrast, Junior testified at trial that he got

4    hit in the head a "couple" of times and then he went down. (LD 2 at 929.)  He

5    was dazed for a second, but then he was able to get up and run. (*Id.* at 929-30.)

6    His cheek was injured and his head was "a little swollen," but he didn't go to the

7    doctor. (*Id.* at 920.)

8         The Court of Appeal also reviewed the inconsistencies in Petitioner's

9    stories about the gun. (LD 7 at 12.)  Petitioner told police he borrowed the gun.

10   (LD 1 at 182.)  At trial, he testified he was going to sell it for a friend. (LD 2 at

11   1532.)  Petitioner said various different things about his use of the gun at the

12   track, and the prosecutor cross-examined him "extensively upon these and other

13   differences between his statement to the police and his testimony." (LD 7 at 12;

14   LD 2 at 1553-60.)

15        Thus, the state court found it "extremely unlikely the jury believed

16   [Petitioner's] claims of self-defense of others, heat of passion, or unreasonable

17   self-defense" because of the "tremendous damage [Petitioner] inflicted upon his

18   own credibility." (LD 7 at 12.)

19        For similar reasons, the inadmissible testimony of the detectives was

20   harmless as to Petitioner's conviction of attempted murder.  Again, there were

21   inconsistencies between Petitioner's interview statements and his trial testimony,

22   as well as inconsistencies between Petitioner's testimony and other witnesses'

23   testimony. (LD 7 at 13.)  Because of the evidence of what Jimmy Cervantes told

24   the police, the accounts of Garcia and Lopez, and the various inconsistencies in

25   Petitioner's statements and testimony, "it is not reasonably probable the jury

26   would have acquitted [Petitioner] of the attempted murder or convicted him of

27   attempted voluntary manslaughter had it not heard the detectives' opinions of his

28   credibility." (LD 7 at 13.)  Moreover, the fact that the jury acquitted him of the

18

1   attempted murder of Lopez "demonstrates that the jury was not unduly swayed by

2   the improper testimony." (*Id.* at 13-14.)

3       The state court's extensive analysis was neither contrary to United States

4   Supreme Court law nor an unreasonable determination of the facts.  Other than

5   Petitioner's conclusory statement that it was "highly prejudicial" (Petition, Memo

6   at 21),[6] Petitioner does not explain why the jury would have reached a different

7   verdict if they had not heard the detectives' opinions.  *See James v. Borg*, 24

8   F.3d 20, 26 (9th Cir.) ("Conclusory allegations which are not supported by a

9   statement of specific facts do not warrant habeas relief."), *cert. denied sub nom.*

10  *James v. White*, 513 U.S. 935 (1994).

11      Petitioner's claim fails.

12  **D.    GROUND FOUR:  Prosecutorial Misconduct and Ineffective**

13  **Assistance**

14      Ground Four has two subgrounds.  In the first, Petitioner argues that the

15  prosecutor improperly argued during her closing.  In the second, Petitioner

16  argues that his trial counsel was ineffective for failing to object to the argument.

17      **1.    Subground One - Prosecutorial Misconduct**

18      "The relevant question is whether the prosecutors' comments 'so infected

19  the trial with unfairness as to make the resulting conviction a denial of due

20  process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed.

21  2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868,

22  40 L. Ed. 2d 431 (1974)).  "Attorneys are given wide latitude during closing

23  arguments."  *Fields v. Brown*, 431 F.3d 1186, 1206 (9th Cir. 2005) (citation

24  omitted).  Some of the considerations as to whether improper argument violates

25  due process are "(1) whether the prosecutor's comments manipulated or

26  misstated the evidence; (2) whether the trial court gave a curative instruction; and

27  _____

28      [6] Petitioner's additional argument in Ground Five added nothing
    substantive to his conclusory statements.  (Petition, Memo at 28-29.)

(3) the weight of the evidence against the accused." *Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005) (citing *Darden*, 477 U.S. at 181-82), *cert. denied*, 546 U.S. 1110 (2006).

During closing, the prosecutor argued as follows:

So sympathy. Okay. We are all human beings. We don't want[] robots back there in the jury room. So while you feel sorry for victims, I know you do, you probably feel sorry for Ramon Reyes. I do. Okay. We are human beings. All right. This is a young man. Dimples is a young guy and so we feel sympathy for people. That is who we are as humans. Sympathy has no place, no role in deliberations. [¶] Does anybody deserve sympathy? It's the children of Leo Elder, it's his sister. He didn't ask for that. It's Kimberly Garcia. She didn't ask to have her ovary shot through, have her cervix punctured by a bullet. So if there is anybody who deserves sympathy it's them. I mean, when you listen to the tape of Ramon Reyes, he is going to be crying, he is going to sound very sympathetic, is going to be talking but you know what? I been through – a lot of my friends have been killed. [¶] All right. First of all, I want [you to] think about this. If you talked on a tape to Leo Elder's children that night, what would that tape sound like? If you made a tape of Leo Elder's sister that night, what would that tape sound like? Kimberly Garcia's in surgery for seven hours could not make a tape of what she said. [¶] So before you start feeling sympathy for this guy on this tape remember what he did. Yes, maybe he has lived in a rough neighborhood. The Cervantes brothers live in the same neighborhood. It was their cousin that was killed. They didn't bring a gun to the racetrack that night. Only one man did in this courtroom. That is him. One man did it at the racetrack, that is [him]. Sympathy just has no place in your deliberations. Make your decision based on the evidence.

* * *

20

1    [¶] He's gotten everything [he] is entitled to as a human being and now I
2    was going to show you Mr. Elder's picture. You know him. You will have it
3    back there with you at the end of this evidence. Here is his picture. I have
4    it right here today. He is a human being, too. He is entitled to something.
5    The defendant has got everything he is entitled to. This man is entitled to
6    something, his children are entitled to something, his sister is entitled to
7    something. Kimberly Garcia who is in pain everyday of her life is entitled to
8    something and the people of this state of California, the human beings of
9    this state are entitled [to] something. They are entitled to [a] verdict of
10   guilty to all the charges and allegations.

11   (LD 2 at 2153-54, 2155-56.)

12       Petitioner argues that the prosecutor's closing violated his due process
13   rights. The Court of Appeal, whose decision is the last reasoned decision under
14   *Davis,* found that Petitioner had waived his right to object on appeal that the
15   prosecutor argued improperly because he failed to object below. (LD 7 at 16.)
16   Respondent argues that this subground is therefore procedurally barred.
17   (Answer at 28.) However, because the procedural bar issue is more complex, the
18   Court will proceed to the merits, which leads to the same result. *Franklin,* 290
19   F.3d at 1232; *see also Lambrix,* 520 U.S. at 525.

20       The state court *did* address Petitioner's alternative ground of ineffective
21   assistance of counsel, finding that Petitioner was not prejudiced by his counsel's
22   performance. The lack of prejudice on ineffective assistance is similar to the lack
23   of prejudice on the alleged due process violation. Because the Court finds that
24   the state court's analysis on prejudice was neither contrary to United States
25   Supreme Court law nor an unreasonable determination of the facts (*see*
26   Subground Two below), Petitioner's due process claim fails.

27       **2.    Subground Two - Ineffective Assistance**

28       The Court of Appeal found that Petitioner's counsel's failure to object to the

1  prosecutor's argument was "objectively and inexcusably deficient." (LD 7 at 17.)

2  However, the court also found that Petitioner would not have "obtained a more

3  favorable result had defense counsel objected to the prosecutor's argument and

4  requested an admonition by the court." (*Id.* at 17.)

5      The state court reached this conclusion for the following reasons. First,

6  Garcia's injuries were severe and would "automatically evoke sympathy" from

7  jurors.[7] Second, the sympathy for Elder was already present because his sister

8  had testified he had died and left three children,[8] and his best friend Parks had

9  testified that he was two weeks from his 36th birthday.[9] Third, the prosecutor

10  argued that the jurors could also have sympathy for Petitioner. Fourth, the

11  prosecutor told the jury that sympathy should not play a part in their deliberations.

12  Fifth, the trial court instructed the jury that they should base their verdict on the

13  ///

14  ///

15  ///

16  _____

17  [7]  Garcia testified she felt "extreme pain" in her abdomen when she was
    shot. (LD 2 at 1002.) She went to the hospital and underwent seven hours of

18  surgery. (*Id.* at 1003.) She was in the hospital for almost a month. (*Id.*) As of
    the trial, which was held over six months after the shooting, she continued to

19  have pain "every day." (*Id.*) "[T]he bullet pierced through my lower intestine. It
    went through my bladder. It went through my uterus, and it destroyed one of my

20  ovaries, and it damaged my cervix." (*Id.* at 1004.) She is unable to run, do
    exercise, or lift anything heavier than 20 pounds. (*Id.* at 1003.) She experiences

21  pain during mundane tasks such as riding in a car. (*Id.*) It isn't clear whether she
    will be able to have children, or if she becomes pregnant, whether she will have

22  complications. (*Id.* at 1004.)

23  [8]  April Pendleton-McGee, Elder's sister, testified that Elder had three
    children, two boys and a girl. (LD 2 at 1226.) She testified he was 35 when he

24  died. (*Id.*)

25  [9]  Parks identified Elder from his picture and said "That's my best friend."
    (LD 2 at 401.) Parks had known Elder for 20 years. (*Id.* at 402.) They went out

26  together every day. (*Id.*) He testified that when they went to the racetrack that
    night, it was "about two weeks before [Elder's] birthday." (*Id.*) After Elder was

27  shot, Parks saw him lying in the bleachers. (*Id.* at 411.) Parks went to get help
    and then went back to his friend, who was alive but breathing shallowly and

28  incoherent. (*Id.* at 413.) Parks went with Elder to the hospital where Elder died.
    (*Id.* at 414.)

1   evidence and not be influenced by sympathy.[10]  And, finally, the jury acquitted

2   Petitioner on the other attempted murder charge indicating that they were not

3   influenced by the prosecutor's improper appeal.  (LD 7 at 17-18.)

4          The state court's decision was neither contrary to United States Supreme

5   Court law nor an unreasonable determination of the facts.  Other than the

6   conclusory statements that the prosecutor's conduct "infected the whole jury trial"

7   and deprived him of ineffective assistance of counsel (Petition, Memo at 25),[11]

8   Petitioner does not explain why the outcome would have been different if his

9   counsel had objected to the prosecutor's argument.  *See James*, 24 F.3d at 26.

10  As the state court found, the trial court gave a curative instruction, and the weight

11  of the evidence against Petitioner was strong.  See *Tak Sun Tan*, 413 F.3d at

12  1115 (citation omitted).

13         Petitioner's claim fails.

14  **E.     GROUND FIVE: <u>Ineffective Assistance - Eddie Cervantes</u>**

15         Petitioner argues that his trial counsel was ineffective for three reasons.

16  The first two were already addressed in Grounds Three and Four respectively:

17  counsel's failure to object to the improper police testimony (Petition, Memo at 28-

18  29) and counsel's failure to object to the prosecutor's argument (*id.* at 29-31).

19  The third is that his counsel failed to impeach witness Eddie Cervantes about the

20  immunity given to him by the prosecutor concerning the gun in the glove

21  compartment of his truck.  (*Id.* at 31-32.)

22  ///

23

24         [10]  The trial court instructed the jury:  "You must not be influenced by

25  sentiment, conjecture, sympathy, passion, prejudice, public opinion or public
    feeling."  (LD 1 at 216-17.)  The court also instructed the jury that they must

26  "follow the law as I state it to you," and that "[i]f anything concerning the law said
    by the attorneys in their arguments or at any other time during the trial conflicts

27  with my instructions on the law, you must follow my instructions."  (*Id.* at 216.)

28         [11]  Petitioner's additional argument in Ground Five added nothing
    substantive to his conclusory statements.  (Petition, Memo at 30-31.)

1    Eddie Cervantes testified he went to the racetrack on the day of the crimes

2    with three of his brothers. (LD 2 at 624.) He testified that Petitioner was a

3    neighbor and a casual friend of his and his younger brothers (Eddie is 4 years

4    older than Petitioner). (*Id.* at 638.) Petitioner did not come to the racetrack with

5    Eddie. (*Id.*) Eddie testified generally as to how the fight started and his own

6    involvement in the fight. (*Id.* at 628-35.) Eddie heard the shots. (*Id.* at 636-37.)

7    He saw Petitioner at Cesar's house earlier that day. (*Id.* at 639-40.) Eddie also

8    saw Petitioner at the track, on the way to the bleachers, and in the bleachers. (*Id.*

9    at 640.) He did not see Petitioner during the shooting. (*Id.* at 641-42.) When

10   Eddie left the track with his brothers after the shooting, Petitioner went with

11   them.[12] (*Id.* at 643.) While driving, a police car pulled behind them, turned on the

12   lights and siren, and ordered them to stop. (*Id.* at 646-47.) Petitioner said, "Don't

13   stop. Let's go." (*Id.* at 647.) Eddie stopped the car. (*Id.* at 648.) Petitioner said

14   "Why did you stop?" (*Id.* at 648.)

15       Eddie testified he had a registered gun in the glove compartment. (*Id.* at

16   649.) Eddie also testified that when Petitioner had gotten into the car he didn't

17   think that Petitioner was the shooter, but he "couldn't be sure." (*Id.* at 650.) "I

18   guess I was wondering why he was just going, 'Let's go. Let's go.' But I can't be

19   sure." (*Id.*) Eddie did not tell the police he thought Petitioner was the shooter,

20   only that he had "heard the shots from where the last place I seen him." (*Id.*)

21       The trial court then called a recess, and, outside the presence of the jury,

22   told the prosecutor that he was "asking [Eddie] a question that might incriminate

23   him. I mean, if he believed that the defendant was the shooter, and he was

24   driving his car away, he could be, you know, in violation of being an accessory."

25   (*Id.* at 651.) Defense counsel said, "There's also the crime of a concealed

26   weapon in his glove box." (*Id.*) The prosecutor offered Eddie "immunity as to that

27   _____

28       [12] The Court assumes that the transcript references to "Raymond" are to
     Petitioner. (LD 2 at 643-44, 646.)

1   particular crime." (*Id.* at 652.)  The court appointed counsel to assist Eddie.  (*Id.*)

2   The prosecution formally offered Eddie immunity, and Eddie's appointed counsel

3   said that Eddie would "answer all questions truthfully." (*Id.* at 672.)  The court

4   verified with Eddie that he understood. (*Id.* at 673.)  The immunity was put on the

5   record. (*Id.* at 674.)  Eddie was later recalled to resume his testimony, and direct

6   examination resumed but only very briefly. (*Id.* at 693-96.)

7          Petitioner argues that his counsel was ineffective for failing to cross-

8   examine Eddie about the gun and the immunity. (Petition, Memo at 32.)  This

9   ground was raised in Petitioner's state habeas petition to the California Supreme

10  Court and was denied without explanation. (LD 11, 12.)  Because the state court

11  rejected the claim in an unreasoned order, the Court has conducted an

12  independent review to determine whether the decision was contrary to, or

13  involved an unreasonable application of, "clearly established" Supreme Court

14  precedent. *Delgado*, 223 F.3d at 982.

15         Petitioner does not explain how a cross-examination of Eddie about the

16  gun would have helped Petitioner.  Nor does he explain how such a cross-

17  examination would have impeached Eddie's credibility.  He simply states that "the

18  proceeding would have been different" had counsel done so. (Petition, Memo at

19  32); *see James*, 24 F.3d at 26.

20         Eddie's testimony was not important.  His most damning testimony was

21  that Petitioner asked him not to stop the car when the police ordered them to do

22  so.  From that statement, the jury could have inferred that Petitioner felt guilty and

23  was nervous.[13]  However, in his own testimony Petitioner admitted to having a

24  gun and to shooting.

25         The evidence presented by the other witnesses was more than sufficient to

26  convict Petitioner.  Eddie didn't see Petitioner shoot anyone.  He didn't see

27  _____

28      [13] Eddie testified about Petitioner's statements in the car *before* the grant
    of immunity.

Petitioner at the time of the shooting.  Petitioner did not tell Eddie anything about the shooting afterwards.

Petitioner's claim fails.

# V.

## RECOMMENDATION

For the reasons discussed above, it is recommended that the District Court issue an Order (1) adopting this Report and Recommendation; and (2) directing that judgment be entered denying the Petition and dismissing this action with prejudice.

DATED: February 20, 2008

ALICIA G. ROSENBERG
United States Magistrate Judge

1

## NOTICE

2       Reports and Recommendations are not appealable to the Court of

3 Appeals, but are subject to the right of any party to file Objections as provided in

4 the Local Rules Governing Duties of Magistrate Judges, and review by the

5 District Judge whose initials appear in the docket number.  No Notice of Appeal

6 pursuant to the Federal Rules of Appellate Procedure should be filed until entry of

7 the Judgment of the District Court.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28